Good morning, everyone. I'm pleased to be sitting with my friends and colleagues, Judge Nygaard and Judge Fischer. This is part of what's known as the first sitting of the court here. It just got carried over to the second week. And we have four cases for this morning, and the first case, well, here it is, United States v. Mitra-Hernandez. Jason Ullman on behalf of appellant, Mr. Leobo-Hilda Mitra-Hernandez. If I may, Your Honor, may I reserve two minutes for rebuttal? Please keep your voice up. I'm a little hard of hearing. Yes, Your Honor. And the plexi is capturing some of you, so make some loud if you could. Yes, Your Honor. Thank you. ICE did nothing to investigate the or to corroborate the tip that they had in this case that was three weeks old. ICE did not investigate whether the person with a generic name in their national database was plausibly or possibly the same person with a generic name that received a ticket here in Pennsylvania. They also did nothing to investigate whether the person who received that ticket for driving without a license or ID, whether he gave the right address to the Hanover police officer. Instead, ICE went out into the field. They conducted a targeted enforcement to find Juan Ramiro. They ignored investigation avenues short of a seizure in which they would have dispelled belief. And they also ignored facts that they learned that did dispel belief. What is the legal premise upon which you rely that they were obligated to seek this sort of corroboration when they had information from law enforcement that there was an individual who fit the general description by virtue of gender, location, height? Why wasn't that sufficient for them to do an investigative stop under Terry? Well, I think that it's not sufficient because this court has said in United States v. Sean Lowe and in United States v. Kareem Brown that those factors are not sufficient. And in those two cases, there was the additional factor that there was an exigency of a violent crime that had recently happened. But in those cases, isn't there a difference? Because here they had a specific address that they believed the individual they wanted was located at. Doesn't that make that different than those other cases? Well, I would disagree because they did have a general location for those other cases. Not general. I'm talking about specific, like an actual building. I understand, Your Honor. I think that what we have to go back to is the test here is reasonableness. And they have a generic name in their database, a national database. They have no link between that generic name in the national database and the particular person here in Pennsylvania.  Did he give the right address to the officer? What is your legal authority to say that an obligation to corroborate on a Terry stop? What's your legal authority for that? I mean, because you keep saying they had an obligation to do that. And I'm asking where would the officer know that was a legal requirement? Your Honor, I think that before they see someone, before they stop someone, they would have to meet the test of reasonableness. And I think that there's too attenuated a connection between the national database person, this generic name for someone who got stopped here, and this address here. So, Mr. Ullman, suppose we agree with you that there was no reasonable suspicion for the stop. Would you agree with me that identity, in other words, who this person was, and immigration status, whether he was here legally or illegally, are matters that are not suppressible? I would respectfully disagree with that, Your Honor. What part would you disagree with? I would disagree with, Your Honor, I would disagree that particular pieces of evidence, the statements of a defendant, items taken from the defendant, those items are suppressible. And that's what we ask for suppression. I agree with you. I didn't say the statements. Identity, who he was, that he was Mitro Hernandez versus Juan Romero or John Doe. He was your client. The fact that he was your client. Okay. I'm not talking about the statements he gave, but immigration status. In other words, what's in the immigration file? Would they be suppressible? Your Honor, I think that depends on where the information in the file was generated from. If we read INS versus Lopez Mendoza carefully, we look in part four of that case when the court is talking about Sandoval Sanchez, and the court discusses the general immigration, I'm sorry, the general criminal suppression rules. And those are the rules that we're being asked to apply in this case. If there's a Fourth Amendment violation, then evidence taken from that violation must be suppressed. Is it a Fourth Amendment violation? Doesn't the court say egregious Fourth Amendment violation? In order to suppress identity evidence itself, there needs to be this additional fact of egregiousness. So there are two different suppression doctrines. Okay. All right. There has to be egregiousness. Well, there are, Judge. What here would be egregious? Well, this court, and I'm sure this court is aware that the district court applied the wrong standard for egregiousness in its opinion below. The court applied the California versus Rochin Shack the Conscience standard of egregiousness. This court has clarified in Oliva Ramos versus Attorney General, egregiousness is a multifactor test, including factors such as was the violation intentional? I think the intentional failure to corroborate any part of this tip from the national database is what makes this an intentional failure, an intentional violation. Wasn't there a tip? I mean, this wasn't two immigration agents in Hanover, Pennsylvania, just going down a list of suspected illegal immigrants. This was somebody who the tip had Juan Romero in the York County area, in the Hanover area. Your Honor, I would agree that A. Juan Romero was in the York County area. A. Juan Romero, yeah. Okay. But why didn't they call Hanover PD? This guy might be black for all they know. This guy might be completely not the person that's in their national database. Well, but Hanover PD said, they either said or through record checks, okay, we had a traffic stop for a Juan Romero. Maybe the same Juan Romero, may not be the same Juan Romero. Here's the address. They go and stake out the address. I'm not sure they've done anything wrong at that point. Well, what they do wrong is pull Mr. Mitra Hernandez over without any kind of proof of traffic violation. All right. They stopped a Hispanic male. They stopped a Hispanic male. And I said, if we agreed with you that they stopped him without reasonable suspicion, where does that get you as to identity and immigration files? So I believe that this is an egregious violation. There are two different documents. How does it get egregious? That's what I'm missing. Sure. Tell me the egregiousness. So the intentionality and also the sole basis for the stop is that it was based on the belief that he's of race, the belief that he's a Hispanic male. And here's why it's an intentional violation. Let me shortcut this. Are you saying that any stop without reasonable suspicion becomes egregious? Well, if it's based on race alone, then yes, Your Honor. That's what this court said in Oliva-Ramos v. Attorney General. Okay. And if I can point out why it was intentional, they had avenues short of seizure, which would have dispelled their belief. They could have seen that the black Hyundai is not parked outside this house. That's the car that the Hanover, Pennsylvania Juan Romero received a ticket in. The other things that they could have done, they could have run the license plates of the cars that are sitting outside this house and seen they don't come back to the person that they're looking for. They claim this is a targeted investigation to find Juan Romero, but they do nothing to figure out, is he actually there? They didn't check the mail. They didn't check the trash. They didn't even request from the U.S. Post Office an address verification, which is easy to do. But why would they have to do that? They stopped the person who went by the name of Juan Romero. They had the address Juan Romero was associated with from the traffic ticket. Why did the officers have to do more when they were looking for Juan Romero? Well, so they don't have any suspicion as to this Hanover, Pennsylvania Juan Romero. Any suspicion they have is from this generic name and their national database. They have no suspicion to the Pennsylvania Juan Romero. They don't call. They don't even get the police report to find out what color is his hat.  Where does that place Juan Romero? They have no evidence that he was in Pennsylvania, and that's in the transcript, Your Honor. That's what Officer Cabrera testifies to. He does not know. He has no evidence placing Juan Romero in Pennsylvania. So what this boils down to is that there are other avenues to corroborate this tip. They could have called Hanover police. They could have got more details about who the guy was in Hanover. They also could have figured out if the guy in Hanover actually lived at this address or had any plausible ties to this address. They failed to do that. They also failed to observe or credit that their suspicion, their belief was dispelled when they saw the wrong car sitting outside. They chose not to run the license plates on this car to find out who is registered as the owner. They follow Mr. Hernandez for a mile and a half and do not see any kind of evasive furtive action or traffic stop. So what this boils down to is they pulled him over because he looks like a Hispanic male and he looks about the right height. And this court has said under U.S. v. Lowe, under U.S. v. Kareem Brown, that's not enough, not even for a Terry stop. And may I add, this wasn't an exigency. This wasn't a situation where cops see I'm sorry, police see facts out in the field that immediately raise suspicion and then are justified in going and investigating those facts. These officers had time to investigate this thing. These officers got this tip when they were at their office. They looked up this guy's name and their national database. So they had investigative time. They chose not to use it. That's why it's an intentional violation. That's why it's egregious. That's why their willful blindness to other leads that would have dispelled their suspicion. That's why the stop amounts solely to a stop based on perceived Hispanic ethnicity. So. If we agree with you totally, you've just argued you reserved your right to appeal the denial of the motion to suppress. Yes, your honor. That's what you reserved. And if we agree with you that the district court was wrong in not granting your motion to suppress, where does that leave this case? Well, that leaves this case on remand with the government prohibited from using the evidence that was tainted by the stop. It would then be the government's burden to try to make out a case with untainted evidence. That's where the case would be at. You'd still have identity and you'd still have the immigration file. If the immigration file did not contain any of the tainted evidence. Well, I think that's a presumption based on facts that the government did not supply in the record. They did not proffer evidence that would prove he's an alien unlawfully in the U.S. without the the tainted evidence supplied by the stop. They failed to make that showing. That's why I understand the tainted evidence is his body and his identity. That's what you say. The tainted evidence is because there was no basis for the stop. Is that your argument? No, no, your honor. They're actually two separate doctrines of suppression. The criminal suppression doctrine and the civil suppression doctrine. Criminal suppression. If there's a violation evidence from the defendant statements of the defendant, those items must be suppressed. I'm only asking about the identity in his body. If we were if we follow Judge Fisher's question and we will agree with you, it goes back on remand. What's left? Is it your position the government cannot introduce evidence of his identity? If we met the civil suppression doctrine, then yes. If we met the element of egregiousness, then yes. That would be a factual inquiry for the district court where all identity alienage evidence would be suppressed. But the narrower ground here is that we met the Fourth Amendment suppression rules. Particular pieces of evidence are suppressed. This is no different. The United States versus Brignone points the Supreme Court case. Particular pieces are suppressed. And then it's on the government to try and make out their case using untainted evidence. Civil suppression. What is your authority for that? What is the you said? There's the civil suppression doctrine. Tell me what case you're relying on for that point. Yes, your honor. I'm relying on INS versus. I see I'm out of time. May I answer that question, please? Yes. It's the civil suppression doctrine. My authority is INS versus Lopez Mendoza. So you're just calling it something different. I understand. I know what case you're talking about, then. Thank you. Perfect. I was trying to make sure we're we're clear that part for Sandoval Sanchez. Judge O'Connor does lay out. Here's criminal suppression. Let's figure out whether we'll suppress something in a civil context. I understand. OK. All right. We'll see you. Thank you. Thank you. May it please the court. Stephen Surtey on behalf of the United States. If Mr. Mitra Hernandez fails to convince this court that the stop was unreasonable or was not supported by reasonable suspicion, then we don't even get to the second outrageousness analysis. If the stop was reasonable, if the questioning was reasonable, then nothing should have been suppressed. Even if this court agrees with Mr. Hernandez. When the officers stopped Mr. Mitra Hernandez and he identified himself as someone other than Ramiro, what's the basis for continuing on to ask any other questions except have a nice day, Mr. Mitra Hernandez? Not the guy we were looking for. Have a good day. What's the basis for asking those next questions? Well, I think you have to look at the entire context of the situation. We have DHS officers who have made a stop specifically to determine whether the driver of the vehicle is legally in the country. No, they stopped him because they thought he was Juan Ramiro. Who they believed was illegally in the country. So the purpose of the stop, it wasn't a traffic stop. The government has never alleged this was a traffic stop. This was an immigration-related stop believing that the driver of the vehicle was in the country illegally. That was the purpose of the stop. Yes, Juan Ramiro. The moment they find out or at least handed an identification that says it's Mr. Mitra Hernandez, that doesn't change the fact that the stop was to find out whether the driver of the vehicle was in the country illegally. What about Mr. Mitra Hernandez would have given them reasonable suspicion that he was in the country illegally? Well, at that point, you can look at it and say he's emerging from a home. He's what? He's emerging from a home, the 22 West Walnut Street address, where there is a target who is believed to be there illegally, even if it's not him. And the only identification he is able to give them at that point is a Mexican identification card. Now, that doesn't go to ethnicity or race. That goes to nationality. And when you have a DHS agent who has stopped a vehicle that they believe is driven by someone who is in the country illegally and is handed an identification card that may not be for that individual but is still from another country, then the government's position would be it's entirely reasonable to ask, hey, are you a citizen of Mexico? And what's your status? Two quick questions consistent with the purpose of the stop and supported by the fact that the individual in question, in this case Mitra Hernandez, provided an ID card from another nation. Now, to Mr. Mitra Hernandez's credit, he immediately admits, yes, I'm a citizen of Mexico and I don't have a right to be here. Why is that germane if he shouldn't have asked the question in the first place? Well, if this court concludes that the question shouldn't have been asked in the first place, then I would agree. It's not germane. However, it's just to show, and this may have more weight on the outrageousness analysis, that we're talking about two quick questions. So we're not talking about a lengthy detention, and we're talking about two questions that are consistent with the purpose of the stop. And in the traffic stop context, and again, this wasn't a traffic stop. This court has repeatedly said, and the Supreme Court has said, that routine police questioning at that point about things like, where are you headed? Where are you coming from? You know, doing warrant checks. You quote, in your opinion, United States versus Thompson, saying that innocent factors taken together may appear suspicious, et cetera. What in here is anything but innocent, but related to nationality or perceived ethnicity? Well, if you're just talking about, if you're talking about after the stop is made, Your Honor? I'm talking about after the identification. Okay, after the identification is handed. Well, again, you have the fact that he was spotted emerging from a home that they believe was a residence of someone who is potentially here illegally. So there's that. You have the fact that, again, the card, and I can't stress enough, the nationality is not ethnicity. Nationality is not race. Nationality is what country you're from. Opposing counsel talked about how, well, they could have thought that Juan Ramiro was black. Well, you know, a person from Mexico can be white. So the nationality is different from ethnicity. And all we have- Where does alienage fall in this bucket? Before I have you answer Judge Nygaard's question, where's alienage? Well, the cases are mixed on what exactly alienage means. I don't want to take you off of that. We'll go back to that. If you could continue to answer Judge Nygaard's question. I think I was pretty close to answering that. At that point, you have nationality coming up as an issue, plus the potential association and living in the same place as someone who is believed to be in the country illegally. So those things go beyond ethnicity or race. They're beyond identity too, though, correct? They would go beyond identity as well, correct? Yeah, I would agree with that, that it does go beyond identity. So I think what Judge Nygaard was driving at is once they came to the conclusion his identity was not that of Juan Romero, why did they continue? Because you have a DHS officer whose job is to determine if someone is in the country illegally. That was the purpose of the stop. It may be a different individual. But in his mind, we now have additional facts that say that this may not be Juan Romero, but it may still be someone who is not in this country illegally. And so you're saying because Mr. Mitra Hernandez presented the Mexican identification card, that that was new information that the agent was beginning to probe? Right. It was new information along with the fact that this wasn't Juan Romero. So it was new information that cuts against the fact that they're looking at Juan Romero, but it's new information that says this is still an individual that may require some questioning as to their status in the United States. Okay. So where is the government and what's the status of this case if we agree with the appellant here that there was not reasonable suspicion to stop the car and that the district court erred in not granting the motion to suppress the statements in the Mexican ID card? Where does that leave the government in this case? Well, if the only error is that the district court should have suppressed the statements in the government ID card, I think we're basically in the same place. If you look at the plea colloquy, at the change of plea, both the facts that were laid out by the AUSA and the facts that were questioned directly to Mr. Mitra Hernandez from the district court, none of them had anything to do with the statements or the ID card. They asked, look, you know, are you a citizen of Mexico, which was part of the immigration file from as far back as 2008 when he was initially removed. Right. They asked him, were you removed in 2008? Yes. The elements of the illegal reentry don't require the defendant to have admitted that he was here. They don't require the defendant to have presented a Mexican ID card. If it goes back to that, if we reverse the district court on the denial of the motion to suppress, doesn't it go back to the district court and give Mr. Mitra Hernandez a chance to decide whether he wants to enter a guilty plea or go to trial? Well, we could certainly do that, although, as I pointed out in my brief, there has at no point been any indication that Mr. Mitra Hernandez would not plead guilty to the exact same thing. That's not the question. It gives him the chance to reevaluate that decision, does it not? It does, yes, though I believe the outcome would be exactly the same. Focusing on the reality, though, assume he were to opt to go to trial and assume that the court determined suppression was appropriate. Tell me what the government's case in chief would be. What would they still have available to them to prove the elements of 1326? Well, what they would have is they would have his immigration file. How would we connect that immigration file with the person sitting at defendant's table? Well, as was discussed in the plea negotiations, his fingerprints were taken, fingerprints were matched, that goes to identity. For the moment, pretend the plea colloquy doesn't exist. Just give me the, think about what the trial would look like. Fingerprints. How is it that we're able to take fingerprints from him? Is it your position that the stop allowed them to take his fingerprints? Well, fingerprints go to identity. I'm sorry. Fingerprints go to identity. And albeit in an unpublished decision, but in the Arriaga-Hernandez case, which applied this Court's Oliva-Ramos case, and indeed had the same author, Judge McKee, fingerprints were at issue in that case. Maybe I had that mixed up with Bowley, but I know Bowley, it was. It was Bowley that had fingerprints at issue as part of the identity, and Bowley said identity is acceptable. So we would have the fingerprints, his identity, and then his immigration file, all of which shows exactly what is needed for him to be convicted of reentry. In front of the jury, would there be, if we were to suppress, could the government adduce evidence there was a stop? And then would that freeze frame, we stop this person, and then what would happen? I'm just trying to find out if we were to suppress, how do we connect this immigration file to the defendant sitting at the defense counsel table? Assuming we were to conclude this was an egregious Fourth Amendment violation, and his identity, his disclosure of his identity was suppressed. Well, I mean, if we're saying that this Court believes it is an egregious violation. I'm not saying we do, just assume for this discussion. Okay. Well, if we assume that this Court finds that there's an egregious violation, and that therefore means that the government cannot produce identity, or is not allowed to produce identity and information, and is not allowed to produce the immigration file, and is not allowed to produce the statements, then I think the government's case is gone. Okay. So in order, so for the defendant to prevail, he's got to prove no reason of suspicion and an egregious violation? Yes. He has to win on basically every one of the three parts of the argument in this case. And if the government prevails on any of those three parts, although admittedly the prolonging of the questioning would, you know, that alone probably wouldn't be enough if the government wins on that. But the important point is, yes, the defendant needs to prevail on all of his arguments in order to win here. I would like to ask you about a portion of the hearing transcript. Sure. The officer initially testifies that they had, quote, information through our criminal database about Juan Romero being of Hispanic descent and his height. And we know from separate paperwork, i.e., the ticket, what address it was. Then on cross-examinations, as your adversary brought this up, the defense counsel cross-examines the officer and they list a series of characteristics, height, weight, et cetera. And then the question goes, you didn't have any of the characteristics or descriptions that I just gave you at that point, correct? And I'm reading from Appendix 80. Right. And he says, correct. How do we reconcile his direct testimony that he recites the things they had with his testimony on cross that he didn't have these characteristics? Well, I had seen that as well. My best read of that, and I don't know, I wasn't the trial at USA here. I've never worked with Agent Cabrera. My read of that is he was questioned also immediately prior to that about the traffic violation, what information was on that. There could have been some confusion there. There is no question that on direct, Agent Cabrera did say we knew that this individual was of a certain height. Also, in the written reports that were submitted both by his agent Lutz and by Agent Cabrera, there is reference to the fact that they pulled the height from the database. And then there's also the fact that after the fact, they did go through and, you know, confirm Mitra Hernandez and, you know, found height information there. So you take all of that together, and it seems to me that there's much more corroboration for the position that, yes, they were aware that the individual they were looking for, believing to be Juan Ramiro, was approximately 5'7 inches tall, despite, you know, what I believe was a misstatement or a misanswer or maybe a little bit of confusion on cross-examination. So focusing on what the agents knew before they stopped the vehicle, what is it that they knew and what was their source of information for that? Well, obviously from the databases we've been talking about, they knew that there was a Juan Ramiro who was believed to be in the country illegally, that he was a person of Hispanic descent, that he was 5'7 inches tall approximately. They knew that a Juan Ramiro had been stopped by local police forces for a traffic violation and gave us his address, the 22 West Walnut Street address. They then went to the 22 West Walnut Street address, and they observed an individual who was of Hispanic descent and 5'7 inches tall coming out. So you now have corroboration of, admittedly, you know, not a lot of corroboration, but certainly something and something beyond just ethnicity to the description of the Juan Ramiro that they were looking for. Now, do I agree with the opposing counsel that they could have done more? Sure. You can come up with that in virtually every single case involving reasonable suspicion, but the test is not could you have done more and you did it. The question is whether you have enough articulable facts, specific articulable facts in front of you, to mean that your suspicion is based on something more than just a hunch. Do you know whether or not the officers had a photograph before the stop? I think the testimony was that they did not have a photograph, although I think there might have been a photograph in the database that they saw at a later date. Okay. Thank you. I see with that my time is up. Just one question. On the immigration tip that they had, did it say where the did immigration tell the officers where they thought this Juan Ramiro was? No, I think the testimony that Agent Cabrera gave was that it was just that he was in the United States. Not just in the United States. Yes. Okay. Thank you. Thank you. Would you what's your best authority for your argument? This is egregious. I know you addressed this before, but I slipped my mind. Tell me. Tell me again. What's your. All right. Let's say right up until the end, as I was questioning opposing counsel. After the I.D., he should have said have a good afternoon. Okay. But let's. Everything's fine. What is egregious? So I think my best authority for it is this court's Oliva Ramos versus Attorney General case, which lays out a multifactor test and carefully analyzes the Ninth Circuit's test and the Second Circuit's test, and I believe the First Circuit's test also and lays out a totality of circumstances analysis. And at that point, when the DHS officer who is doing a targeted investigation for one remittal then learns he doesn't have one remittal. Why? Why is this man still seized? Every single act of failing to follow investigative leads. Every single act of continuing with seizure when they have facts that dispel belief. Every single act makes this an intentional violation. And I believe that my colleague up here would not be that he was curious. You know, he finds out he has a Mexican driver's license. Are you are you a Mexican? And then he goes on from there. Just curiosity. He wasn't didn't intend anything bad. Well, I respectfully disagree because Mr.  He is stopped. That's questioning happens during a seizure. So then the Fourth Amendment has to be complied with. I believe my colleague here actually clarified something I did not realize. Height was not confirmed until after Mr. Mitra Hernandez was arrested and processed. So we don't even have the height factor of Mr. Mitra Hernandez being the supposed right height as the generic DHS person. But what isn't the reasonable understanding is that officers saw someone that fit the height that they knew of for Romero? Well, when they saw Mr. Hernandez, Mitra Hernandez exit the building. I see my time is up, Your Honor. May I answer your question? Thanks. I think that's that. I think that what he's saying is that the height was if I made the height was confirmed after the arrest. When they see this person leave the house, they they they don't have a tape measure out. They don't have any way of confirming this person's height. There's no testimony about why they thought this guy was possibly the right height. It sounds to me like it was confirmed after arrest. Let me see if my colleagues have anything further. Thank you. All right. Thank you very much. Thank you both for your very helpful arguments and briefing. And the court will take the matter under advisement. Thank you.